UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 4:18-cv-_____

_____
SYLVESTER AGYEAH                   )
                                      )
       Plaintiff                 )
                                      )
v.                                   )
                                      )
CITY OF WORCESTER, CITY MANAGER   )
EDWARD M.AUGUSTUS, DET. SCOTT D.   )
CALHOUN, DET. MICHAEL F. RYDER, OFFICER  )
MICHAEL W. MCGRATH, DET. KYLE S. CORTIS,  )
DET. BRIAN M. PISKATOR, DET. DANA S.  )
RANDALL, and OFFICERS, JOHN DOE1-3,   )
                                      )
       Defendants             )
_____

## PLAINTIFFS' COMPLAINT AND REQUEST FOR JURY TRIAL

## INTRODUCTION

1. The Plaintiff, Sylvester Agyeah, was an UBER driver cruising in search of fares when a flock of vehicles converged and blocked his path as he drove down Louden Street towards Main Street in Worcester.  Men emerged from several cars and converged on a white vehicle, screaming and cursing as they opened the driver's door and began punching him.  There were no police in sight. The assailants wore street clothes and displayed no badges or other law enforcement insignia. Agyeah, thinking he was at the scene of a crime in progress, held his cell phone out the window to record video.

2. For that, the assailants -- who turned out to be plainclothes police -- assaulted him, dragged him from his vehicle, clamped handcuffs on him tightly enough to draw blood and cause nerve damage, confiscated his phone, and tried to frame him on a series of baseless criminal charges. The officers did this knowing that Agyeah had an absolute constitutional right to record public police activity and had committed no crime.

3. Agyeah had unknowingly driven into the middle of a Worcester Police Department ("WPD") sting operation in Worcester's Main South neighborhood that evening of April 26, 2018. As he approached the intersection a female officer posing as a prostitute got an offer and signaled her colleagues to arrest the man Agyeah shortly saw being punched. Though Agyeah had every right to record them the Defendant officers were incensed. The first uniformed officer on the scene, approaching Agyeah from behind, slapped the phone from his hand and told him "Go fuck yourself" minutes later when politely asked to return it.

4. After Agyeah realized he was dealing with police, another officer in full uniform assaulted him – knocking the phone he was recording from his hand.  Police confiscated his phone without consent.  An officer became enraged and arrested him when he refused to give them the password to his phone. An officer demanded he explain why he had been recording, to which he replied: "For my safety."  After Agyeah, who is Black, disclosed under questioning that he is from Ghana an officer asked him: "Is this how you fucking monkeys treat your police officers?"  Agyeah addressed the officers as "Sir" and pleaded with them to "treat me like your brother." But one officer repeatedly twisted the handcuffs and bent his fingers and thumbs as if to break them.  The final assault came just before Agyeah was led to a transport wagon when an officer raised his cuffed arms high behind his back into an unnatural and agonizing position.

5. In this action Agyeah brings state and federal civil rights claims against the City of Worcester and City Manager Edward M. Augustus for failing to properly train, supervise, and discipline officers to respect the rights of citizens to record videos in public places, to be free from unreasonable seizure and from the use of excessive force.  He brings federal claims against individual officers for unreasonable seizure, excessive force, for threats, intimidation, coercion, for failure to intervene, for denial of his first amendment right to record the police, for denial of due process and conspiracy to injure him and violate his rights.  He also brings claims against the officers in common and statutory law of Massachusetts for assault and battery, false arrest, malicious prosecution, conspiracy, intentional infliction of emotional distress, and violation of the Massachusetts Civil Rights Act.

## JURISDICTION

2. Plaintiff brings this action pursuant to Massachusetts State Civil Rights Statute, common law of tort, the Massachusetts Declaration of Rights, and under 42 U.S.C. § 1983 for violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. Title 28 U.S.C. § 1331 and 1343 provide federal question jurisdiction over the federal claims, and 28 U.S.C. § 1367 provides supplemental jurisdiction over the state law claims.

## PARTIES

3. Plaintiff Sylvester Agyeah ("Agyeah") is and was at all pertinent times, a resident of Worcester, Worcester County, Massachusetts.

4. Defendant City of Worcester ("the City") is a duly chartered municipal corporation of the Commonwealth of Massachusetts with a place of business abode at 455 Main Street, Worcester, Worcester County, Massachusetts.

5. Defendant Edward M. Augustus ("Augustus") has been the chief executive officer of the City, with the job title of City Manager, since January 7, 2014. He resides at 63 Illinois Street, Worcester, Worcester County, Massachusetts.

2

6.      Defendant Detective Scott D. Calhoun ("Calhoun") was at all pertinent times a duly appointed and sworn officer of the Worcester Police Department ("WPD") residing in 27 Joel Scott Dr, Holden, Worcester County, Massachusetts.

7.      Defendant Det. Michael F. Ryder ("Ryder") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides at 74 Temple St. West Boylston, Worcester County, Massachusetts.

8.      Defendant Officer Michael W. McGrath ("McGrath") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in 6 Birch Dr. Sterling, Worcester County, Massachusetts.

9.      Defendant Detective Dana S. Randall ("Randall") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in 6 Tennyson St, Worcester, Worcester County, Massachusetts.

10.     Defendant Det. Kyle S. Cortis ("Cortis") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides in 145 Laurel St. West Boylston, Worcester County, Massachusetts.

11.     Defendant Det. Brian M. Piskator ("Piskator") was at all pertinent times a duly appointed and sworn Worcester police officer, and he resides at 103 Mower St., Worcester, Worcester County, Massachusetts.

12.     Defendant Officers Does 1-3 were at all pertinent times duly appointed and sworn Worcester police officers whose identities are unknown at present but who reside in Worcester County, Massachusetts.

13.     Each individual defendant is sued in his individual capacity for conduct done under color of law.

## FACTS

14.     Each of the previous paragraphs is incorporated as if fully set forth herein.

15.     At all pertinent times Augustus was the keeper of the peace in Worcester and the policymaker and chief executive of the City, with authority to hire, discipline, and fire WPD employees and to adopt and/or revise the policies and practices of the WPD.

16.     At all pertinent times Augustus had responsibility for training, oversight, supervision, and as necessary discipline, suspension, or termination of WPD officers so that their conduct

would conform to WPD policy and to the law.

17.　　At all pertinent times Augustus knew that if the City failed to properly monitor, and supervise officers' use of force and to investigate complaints of excessive force and instances of unreported or inadequately explained arrestee injuries, persons would likely suffer injury and/or violation of their rights as a direct result.

18.　　At all pertinent times Augustus knew that if the City did not investigate and as appropriate impose discipline for officer violations of the rights to freedom of expression and to freedom from unreasonable force or seizure, persons would likely suffer injury and violation of fundamental rights as a direct result.

19.　　Except for Augustus the individual defendants were at all pertinent times members of the WPD Vice/narcotics unit ("Vice Squad").

20.　　WPD records show the members of the Vice Squad involved in the said John Sting ("JS") operation included: Vice Squad commanding officer Sgt. Christopher Panarello, Officers John Athanasopolous, Steven Bonczek, Mary Brabbs, Allan Burnes, Terrence Cahill, Scott Calhoun, Kyle Cortis, Patrick Gaffney, Margaret Giarruso, Stephen Mitchell, Patrick Moran, Brian Piskator, Dana Randall, Nathan Reando, Ramon Roman, Michael Ryder, Steven Sargent, Rebecca Aguilar, Rebecka Mailea, and officer Michael McGrath.

21.　　At all times material to this complaint, Agyeah worked a full-time day job and worked nights as an UBER driver.

22.　　On April 26, 2018 at approximately 9:30 pm Vice Squad members were conducting a "John Sting" ("JS") operation at Main and Louden streets in which an undercover female officer posed as a prostitute or "decoy" soliciting customers, or "Johns" for arrest by other undercover officers waiting nearby.

23.　　On the date in question at about 9:25 pm Agyeah turned his SUV onto Louden Street heading for the Main Street intersection a block away.

24.　　Loudon Street is a public way in Worcester.

25.　　Unbeknownst to Agyeah the decoy officer, Rebecka Mailea had allegedly gotten an offer of sex for money from the driver of a white car, Mustafa Ismail ("Ismail") and had signaled her Vice Squad colleagues to arrest him.

26.　　A private video surveillance from a home on Louden Street captured the events on the night in question.

27.　　When Ismail attempted to do a three-point turn on Loudon Street three to four undercover police cars came down from the top of Loudon to block Ismail's car.

28.    As he approached the intersection Agyeah found his path blocked as several vehicles surrounded a white car in the opposite travel lane of the street.

29.    Agyeah slowed and stopped his vehicle as he reached the scene and heard one of the men shout "Get out from your motherfucking car" as others opened the driver's door of Ismail's car and start punching him inside and outside of his car.

30.    Agyeah heard no announcement that the men were police and saw nothing – no badge, dog tag, insignia, clothing, or gear–suggesting they were police.

31.    Believing he was witnessing an organized criminal assault on Ismail, Agyeah lowered the window of his SUV and started using his cell phone to document the incident by video recording.

32.    Agyeah thought the men attacking Ismail were gang members, not police, he did not lean out from the window of his vehicle, he did not yell at, speak to, comment on, or attempt in any way to interfere with them.

33.    At about the time that Agyeah started video recording Officer McGrath pulled up from behind him to his left side in a marked WPD SUV, blocking him in.

34.    McGrath, in full WPD uniform, got out of the cruiser and as he moved toward the arrest scene saw Agyeah recording his colleagues, approached him from behind and smacked the phone from Agyeah's hand to the pavement in an intentional, unjustified, and unlawful assault.

35.    At that time and place the public, Agyeah included, had the right to record a public occurrence, including one involving police.

36.    Few minutes later, McGrath returned back to speak with Agyeah. Agyeah asked McGrath "Sir, why did you do that?"

37.    McGrath said he had not seen Agyeah, which was not true.  When Agyeah repeated his question he told him to relax.  When Agyeah asked politely if he could get his phone back a third time, McGrath told him "Shut the fuck up."

38.    McGrath then picked the phone from the pavement and gave it back to Agyeah.

39.    After returning the phone to Agyeah, McGrath rejoined the other officers and on information and belief informed them that Agyeah had been video recording the arrest of Ismail.

**Officers wanted to know why Agyeah was video recording them**

40.     The officer defendants conspired and, whether tacitly or explicitly, agreed among themselves to confiscate the phone, access it to review and erase any compromising footage of video from Ismail's arrest, and to take reprisals against Agyeah if he did not cooperate.

41.     Meanwhile, after the phone was returned him, Agyeah re-activated it his video camera and began recording again from the interior of his vehicle while commenting on McGrath's behavior: "I have not done anything, he [Officer McGrath] just hit my phone down and then I say something and he says, "Shut the fuck up."

42.     About 24 seconds into this recording the video captured an officer wearing a hoodie approaching, Officer Cortis with another officer and as Agyeah protests, "I haven't done anything…" Cortis, assaulted him, reaching inside the SUV, seizing the phone from him and saying: "It's evidence now." See **Exhibit # 1**, a still photograph of Officer Cortis as he approaches to take Agyeah's phone.

43.     Another officer, Ryder, opened the driver's side door of Agyeah's SUV, turned the ignition off, took the keys, and without permission or right began searching the glove compartment of his car.

44.     The officers had no permission, warrant, or other legal cause to seize the phone or keys or to search inside the vehicle.

45.     Cortis and Officer Randall, then confronted Agyeah and asked him "What's the password to your phone?"

46.     Other officers were close by including Ryder, Calhoun and upon information belief, Officer Piskator.

47.     As the officers knew, Agyeah was under no legal obligation to give them access to his cell phone password.

48.     He refused to provide the password, telling them, "That's my phone."

49.     An officer, Randall, responded: "You're done!"

50.     They were going to punish him for refusing to give them carte blanche access to his phone.

51.     Agyeah did not resist as officers pulled him from his SUV, raising his hands above the shoulders.

52.     At that time Agyeah was uninjured; he sustained all of the injuries complained of herein after he had been taken into custody and in handcuffs, without resistance, and at no time was he noncompliant while in custody.

53.     Agyeah was surrounded by several vice squad officers including Randall.

54.     As few onlookers congregated observing the scene created by Ismail's arrest, Randall without explanation yelled, "Stop hitting me, stop hitting me."

55.     Agyeah, who never resisted, touched, or assaulted any of the officers, including Randall, answered, "Sir, I did not touch. Please!"

56.     This despicable police trick would set the stage that ultimately led to Agyeah's arrest and the issuance of false criminal charges against him

57.     Randall, then asked Agyeah, "Why were you recording us?"

58.     Agyeah responded, "For my safety."

59.     Agyeah complied immediately when Randall ordered him to put his hands behind his back.

60.     Officer Calhoun and other officers were present.

61.     Ryder then with Calhoun's assistance clamped the handcuffs extremely tight onto Agyeah's wrists.

62.     Then Ryder, on information and belief with Calhoun next to him, began pushing Agyeah while twisting his arms and wrists and squeezing the cuffs on the right side.

63.     Police radios captured Agyeah's voice crying and begging repeatedly, "Please."

64.     At one point Agyeah pleaded with Ryder to stop, "Please, treat me like your brother."

65.     Ryder responded by twisting his wrists and bending some of his fingers and thumbs backward as if to break them.

66.     Agyeah began crying and told Ryder it was not a crime to record video and continued to plead for Ryder to treat him like a brother.

67.     Calhoun, who had walked away from Agyeah returned and asked him for his phone password.

68.     At this time an officer, who upon information and belief Agyeah believes to be Officer Piskator, asked Agyeah "Where do you come from?"

7

69.  Agyeah, a Black man with a distinct West-African accent, answered he was originally from Ghana.

70.  Shortly after his response, Ryder made the racist statement noted in ¶3 above, calling Agyeah and other Ghanians "monkeys."

71.  Agyeah, shocked by Ryder's abusive and racist conduct, asked to speak with a supervisor.

72.  His request enraged Ryder some more, who retorted, "Motherfucker, I am the supervisor, what the fuck do you want?"

73.  Finally, Ryder, who was not a supervisor, told Agyeah "If you talk again, I am going to take you down."

74.  Racist hate speech by a police officer directed at a person in custody violates that person's right to freedom from unreasonable seizure.

75.  An on-duty police officer has no right under the First Amendment or under any other constitutional or statutory provision to address or refer to an arrestee in his presence with racist hate speech or to prevent them from the filming the police.

76.  Ryder's words and actions served no legitimate law enforcement purpose and were done for the sole purpose of intimidating, humiliating, and inflicting pain and punishment.

77.  No reasonable officer could believe either the physical or the verbal conduct of Ryder to be lawful nor could any reasonable officer, upon hearing such speech or seeing such conduct by another officer, fail to intervene and to report the racist and sadistic misconduct of another officer.

78.  Calhoun and other defendants were in a position to stop Ryder from inflicting abuse and excessive force on Agyeah but failed to do so.

79.  Officer Piskator, told Agyeah he should be quiet and Agyeah told him he was hurting him.

80.  Officer McGrath, who was also nearby, asked Agyeah about his ID.

81.  Agyeah told him his ID was with his phone-- McGrath retrieved the ID and put in in his back pocket.

82.  Because of pain and fear, Agyeah defecated on himself.

83.     He told Calhoun and Ryder, and Ryder advised him: "Motherfucker shut your mouth up, you ain't seen shit yet."

84.     While being led to Main Street to be transported into a police wagon Agyeah, distraught and in pain, cried and complained his handcuffs were too tight.

85.     Both Ryder and Calhoun, who walked him to the police wagon, ignored Agyeah's complaint.

86.     Before walking him to the police wagon from Loudon Street, Ryder maliciously raised Agyeah's handcuffed arms to cause him to experience more unnecessary pain and discomfort.

87.     There was no legitimate purpose for this conduct.

88.     Worcester police incident reports listed Calhoun as Agyeah's arresting officer.

89.     Ryder did not prepare a police report, though he used force against Agyeah and was required under WPD policy to document his actions and the force he used.

90.     The absence of a written report on the part of Ryder evinces the existence of a code of silence within the WPD by which officers fail to report their own uses of force without concern that other officers would do so.

91.     At no time did any officer report to anyone Ryder's use force vis-à-vis Agyeah or the use of racist and abusive language directed at him.

**<u>False Statements Made by Officer Calhoun</u>**

92.     In the arrest and incident reports, as well as in his statement of facts seeking criminal charges against Agyeah, Calhoun knowingly made false statements to fabricate a fictional account of Agyeah's conduct.

93.     Calhoun falsely reported the "[d]river of the Pilot, Sylvester Agyeah (dob. xx/xx/xx) was hanging out of the window in his vehicle yelling at officers attempting to (sic) affect Ismail's arrest."

94.     Calhoun continued with an elaborate police story: "Officer Michael McGrath, who was in full uniform and operating a marked cruiser, could not get to the scene to assist fellow officers.  Officer McGrath was force to exit his cruiser and run around Agyeah's vehicle. Agyeah had moved his vehicle dangerously close to where officers were attempting to affect (sic) Ismail's arrest, with his headlights bearing down on officers at the scene. This action created considerable concern for officer safety."

95.     According to Calhoun's report "Agyeah was ordered several times by officers on scene to vacate the area, which he repeatedly refused to so. Agyeah instead continued to yell at

office on scene, interjecting himself into the incident which he otherwise had no legitimate purpose or involvement."

96.    Calhoun continued with the following additional false narrative, "Agyeah refused [to leave the scene] and continued yelling and arguing with officers. I warned Agyeah that he would be placed under arrest for interfering with police officer and disorderly conduct, if he continued. Once again, Agyeah continued to yell at me and officers placing Ismail into custody. I ordered Agyeah to exit his vehicle, but he refused. I opened the driver's door and advised Agyeah that he was being placed under arrest. Agyeah exited the vehicle and was told to turn around and place his hands on the vehicle. Agyeah initially complied, however, he continued yelling.  His behavior was now causing more people to exit their homes to investigate the disturbance, as well as causing other to begin yelling profanities at the police.  Once again, Agyeah's behavior was escalating the situation and causing further concern for police safety.  While attempting to place Agyeah into handcuffs, he began to struggle with myself and officer Michael Ryder. Agyeah pulled his arms away from Officer Ryder and I, then attempted to turn towards us.  Believing Agyeah was going to attempt to try and flee and/or fight, Officer Ryder and I forced Agyeah back against the vehicle and regained control of his arms. I used a wrist lock technique to regain control of Agyeah's arm. Once we gained control of his arms, Agyeah was placed into handcuffs. After being placed into handcuffs, Agyeah continued to yell that he did nothing wrong and struggling to free himself from custody."

97.    Calhoun knew that his statements were riddled with falsehoods.

98.    At no time did Agyeah hang out of his vehicle or yell at the police.

99.    Agyeah did not use his vehicle or take any other action to intervene in or impede the arrest of Ismail.

100.    Agyeah was never ordered to leave the scene or to move his vehicle, nor could he have done so once McGrath blocked him.

101.    Agyeah did not create a scene or resist arrest.

102.    Any disturbance was caused by Defendants during the arrest and beating of Ismail and the arrest and abuse of Agyeah in violation of his First Amendment and other constitutional rights.

103.    Calhoun's did not mention in his report that Agyeah was video recording the police or that Cortis confiscated Agyeah's phone without permission or a warrant.

104.    The defendants, including Cortis, Calhoun and Ryder took custody of Agyeah's phone in order to get rid of any video evidence of their conduct.

105.  Indeed, this is the reason why Calhoun did not mention or list in a WPD custody report Agyeah's phone as "Personal Property" as he was required to do.

106.  Weeks after his arrest, Agyeah's court appointed criminal lawyer insisted to a district court judge on the return of his cell phone after alerting the court no one at the WPD seemed to know what had become of it.

107.  On June 8, 2018, nearly forty-two days after seizing Agyeah's phone, Det. Cortis applied to a Worcester Clerk Magistrate for a search warrant to obtain "Video surveillance and/or photographs of crimes by Mustafa Ismail (X/XX/XX) on April 26, 2018."

108.  Cortis alleged in a much delayed request for a search warrant that during Ismail's arrest, "…[I] was notified by an involved officer that a male later identified as Sylvester Agyeah (X/X/XX) was recording the crimes being committed by Mr. Ismail during the arrest with his cellular phone and requested that it be seized as evidence.  Agyeah was sitting in the operator's seat of a Honda Pilot (MA Reg: 452XN4). I then approached the driver's side window which was open at the time and advised Agyeah that his cell phone was going to be seized by the Worcester Police as evidence of crimes being committed by Mr. Ismail. I retrieved the phone and secured it in my unmarked Worcester Police vehicle.  I then drove directly from the scene to the Vice Squad and secured the phone pending authorization of search warrant to obtain video surveillance of the above mentioned crimes being committed by Mustafa Ismail."

109.  Cortis, who prepared a detailed police report in connection with the Louden Street arrest of Ismail in which he admitted striking him twice, never mentioned he snatched and took Agyeah's phone from him by force.

110.  Cortis' taking of Agyeah's phone had nothing to do with obtaining video evidence of Ismail's alleged crime.

111.  Instead, the taking and retention of the phone for more than forty days was done for his group to determine if it contained damaging video feed that could contradict the Ismail police narrative penned by his colleagues.

112.  Cortis' search warrant was granted to search Agyeah's cell phone.

113.  A district court judge had to order the DA's office and the WPD to account for Agyeah's phone.

114.  The WPD's own video recording of Calhoun and Ryder putting Agyeah in the police wagon demonstrates the untruthfulness of one of Calhoun's false claims: that Vice Squad officers were clearly identifiable as such because they had "badges fully displayed along with service weapons, handcuffs and radios."

115.    No such insignia or other signs of law enforcement are visible in clear frontal views of the officers as they place Agyeah in the back of the police wagon. An image from the video is attached as **Exhibit 2**.

116.    Another surveillance video obtained from a Louden Street property shows men in plainclothes, one of them in shorts – again with no visible indication that they are police. **Exhibit 3.**

117.    Calhoun reported Agyeah was arrested for: "Interfering with a Police Officer, Disorderly Conduct, Disturbing the Peace, and Resisting Arrest."

118.    Although Agyeah had visible injuries and bleeding from cuts in his writs that had been caused both by Calhoun and by Ryder's actions, the use of force against him and the resulting  injuries were not documented in any report as required by WPD policies and procedures regarding documentation of the use of force and documentation of injuries to prisoners.

119.    The Defendants falsely arrested and prosecuted Agyeah on bogus charges; assaulted and injured him while compliant and handcuffed; and berated him with obscene, racist language for being a Black man exercising his First amendment rights.

120.    Det. Ryder, Calhoun and McGrath violated Agyeah's constitutional right to due process by intentionally making false statements and/or by omitting true exculpatory evidence in order to further their malicious criminal prosecution of Agyeah.

121.    Defendants, including Ryder, Calhoun, McGrath and other unnamed Defendants, knew they were prohibited from fabricating evidence or framing individuals for crimes they did not commit, and no officer could reasonably believe otherwise.

122.    There was no legal justification for any of the Defendants actions and no reasonable officer would believe that using excessive force, fabricating evidence, discriminating against an arrestee on the basis of the color of their skin and framing individuals for crimes they did not commit was constitutionally acceptable.

123.    To assist in hiding the outrageous conduct and actions of the Defendants, and in concert with them, Officer McGrath issued a false traffic citation that accused Agyeah of "Failure to Move over" and assessing a fine of $105. **Exhibit 4,** citation.

124.    While removal of Agyeah's SUV from the scene after his arrest was not urgent, McGrath purposely had the vehicle towed in order to subject him to additional expense and inconvenience.

125.    During a court hearing appealing the traffic citation that took place on July 25th, 2018, McGrath lied repeatedly in furtherance of the conspiracy to violate Agyeah's rights, including but not limited to his testimony that he hadn't seen Agyeah shooting video with

the phone and by failing to disclose exculpatory information to the court.

126.    The traffic charge against Agyeah for "failure to move over" were eventually tossed out of court by a District Court judge.

**Agyeah's booking:**

127.    Police records show Agyeah was placed under arrest at approximately 9:30 pm.

128.    Agyeah was transported to the WPD and was booked in accordance with WPD Instruction for Handling Prisoners, or Policy 700 effective 9/13/2015.

129.    At his booking Agyeah was demonstrably injured and stated clear and unambiguous allegations of blatantly unlawful misconduct by WPD officers in retaliation for a person lawfully video recording their conduct.

130.    But first, on arrival at the police station Agyeah was placed in a holding cell for more than four hours without medical attention despite multiple complaints of wrist injury and pain.

131.    Members of the cell room thereby demonstrated deliberate indifference to his serious medical needs.

132.    One cell room staff member did have the decency to remove Agyeah's overtight handcuffs and handcuff him again but this time with his hands in front and without the cuffs tightened so as to cause injury.

133.    Agyeah became dizzy in the WPD holding cell and laid on the floor of the cell until an officer opened the door to check on him, and tapped on him with a booted foot on his shoulder.

134.    As the booking officer read the charges to him – disorderly conduct, disturbing the peace, resisting arrest, and interference with police officers – Agyeah was incredulous saying, "I never disrespected, never resist arrest." See **Exhibit # 5-still photos extracted from booking tape on 4-27-2018.**

135.    During the booking a police supervisor was present in accordance with WPD policy.

136.    In accordance with a list of questions that Policy 700 required Agyeah was asked if he was sick or injured.

137.    Agyeah replied "Yes" and explained how he had been injured, stating at one point, "He just grabbed my arm squeezed it and raised it up. . . The way he hold my hands without [me] resisting arrest." See, **Exhibit # 5.**

138.   When the officer in charge asked, "You were handcuffed in the back and that's how you received the injuries to your wrists?" Agyeah responded affirmatively.

139.   During his booking Agyeah made clear his belief that his mistreatment was extreme, saying: "The way they treat me, I pooped on myself. I'm not going to hide that from you." *Id* at page 3.

140.   He also alerted to the booking supervisor of retaliation by officers for video recording the police, saying: "I was just recording and guess that's why they did they took my phone."

141.   When the booking officer asked, "Do you need emergency medical attention?" Agyeah replied "Yes, but I will go on my own. I just want go home, I'll go to the hospital," he had already been at the police station for close to 4 hours.

**Agyeah's losses**

142.   After bailing out of the WPD lockup Agyeah went home.

143.   On May 17, 2018, he presented at the emergency department of UMass Memorial Medical Center complaining of bilateral wrist pain and stating he had been arrested and a "police officer handcuffed him tightly and twisted his thumbs."

144.   He complained of bilateral wrist pain, right hand pain, and tingling of two fingers of the left hand.

145.   The examination, three weeks after the incident, showed abrasions to the ulnar aspect of both wrists.

146.   To this day Agyeah has visible scars on both wrists.

147.   At examinations later that year at the UMass Hand and Upper Extremity Center Agyeah complained numbness in two finger joints of the left hand and pain in the right hand fingers, which doctors found to be consistent with neuropraxia (nerve injury) or cubital tunnel syndrome, a condition involving the unlar nerve.

148.   His injuries and scarring were not *de minimis*.

149.   He continues to experience problems in both wrists and emotional distress from the trauma of the incident and his prosecution.

150.   As a result of the trauma he suffered in Worcester Agyeah did not resume driving for UBER until October of 2018, and at that time began driving in Boston rather than risk further contact with Worcester police.

151.   Later on UBER terminated him because of his arrest and his pending criminal charges.

152.   At Agyeah's trial in May of 2019 Calhoun, McGrath, and Ryder lied repeatedly under oath as they tried to convince the jury that Agyeah thought they should not be arresting Ismail and took it upon himself to interfere and then resisted when the police arrested him.

153.   Calhoun testified that Agyeah "was yelling from his vehicle," refused to leave the area when ordered to and "did not believe that the person did anything wrong and that he shouldn't be placed under arrest," Calhoun testified.

154.   Ryder repeated a similar false narrative to the jury in an effort to convict him – he had already learned from McGrath's attendance to his traffic appeal hearing Agyeah testified he observed the officers beating Ismail.

155.   According to McGrath's false trial testimony, Agyeah's head, shoulders, and upper torso were hanging out the window of the SUV as he yelled at the police, and at one point he moved the vehicle closer to the officers subduing Ismail in his effort to intervene.

156.   The jurors didn't buy any of this, but they did accept Calhoun and Ryder's false testimony that Agyeah resisted arrest.

157.   Calhoun testified that as he and Ryder were trying to apply handcuffs "he used force to pull away from us" in order to thwart them.

158.   Ryder claimed Agyeah [Agyeah] "pulled his arm away from me" as the officers tried to cuff him and that after cuffing he continued yelling and screaming and would not calm down."

159.   This occurred at a point when police radios were picking up sounds from the scene, and Agyeah's voice could be heard, not yelling but pleading " . . . Please."

160.   Ryder also stated falsely from the witness stand that "we all had our badges out" when video evidence showed they did not.

161.   Agyeah was acquitted on the interference, disturbing the peace, and disorderly conduct charges but convicted on the resisting arrest charge.

162.   He was wrongfully convicted of resisting as a direct result of the false testimony from Ryder, McGrath and Calhoun, acting in furtherance of their conspiracy to punish Agyeah for recording the police and for refusing to provide them with his phone password.

163.   A surveillance video from a police wagon mounted camera which would have bolster and exonerated Agyeah exposing the lies of Calhoun and Ryder was not shown to the jury.

164.    A notice of appeal was filed regarding the resisting arrest conviction, and a motion for a new trial is pending in the Worcester District Court.

**Worcester's failure to investigate Agyeah's complaints of abuse and injury**

165.    The WPD and the City ignored Agyeah's verbal complaints at booking of being arrested, injured, and deprived of his phone because he had filmed the police.

166.    In doing so the City and WPD ignored explicit requirements and the plain intent of its Policy 700 regarding injured prisoners and police conduct.

167.    Under WPD Policy 700 if a prisoner at booking complained of injury or abuse at the hands of police the officers involved had to explain any injuries and respond to any misconduct allegations.

168.    Policy 700 provided that if a prisoner alleged physical abuse or other misconduct by officers the cell room supervisor would speak with the prisoner to learn the specifics of the allegations and then report them to the deputy chief for the Service Division and to the supervisor(s) of the officer(s) involved.

169.    Policy 700 required the supervisor to "direct the arresting/involved officer to prepare and submit an incident (arrest) report that details the prisoner's injuries (if any) and the source/cause of these injuries . . ."

170.    The WPD's deputy chief in command of the Service Division was required to "review the reports relative to this arrest to determine whether the cause of the injury was identified and documented."

171.    If the deputy chief was suspicious "as to whether the arresting officer or other involved officer engaged in questionable conduct, the matter is to be brought before the Chief of Police," who could order an investigation by the WPD Bureau of Professional Standards ("BOPS").

172.    The cell room supervisor's report and the arrest report also went to BOPS, which could recommend investigation to the chief if, as was the case with Agyeah, an arrestee's injuries remained unexplained.

173.    Finally, regardless of what the deputy chief, the chief, or BOPS might decide, Policy 700 required that "[p]risoners who allege that he or she was physically abused by police shall be given a WPD Citizen Complaint Form upon their release from custody or have one placed into their property." (Emphasis added.)

174.    If an arrestee submitted a written complaint on the Citizen Complaint Form it would go to BOPS for investigation.

175.    In Agyeah's case, neither Calhoun nor any other officer involved during his arrest was required to account for his injuries, and despite the total lack of explanation no one at the WPD duty bound to account for them sought an investigation.

176.    The cell room supervisor did speak with Agyeah and submitted a report to the Service Division commander Deputy Chief McGinn and Vice Squad commander Captain Joseph Scampini.

177.    But instead of requiring Calhoun to explain Agyeah's injuries as the policy required Scampini rubber stamped the report of Calhoun that said nothing about why Agyeah was brought to the police station bleeding from the wrists and complaining of abuse.

178.    Despite the lack of explanation for Agyeah's injuries neither the Service Division commander Deputy Chief McGinn, Chief Steven Sargent nor BOPS called for investigation.

179.    The WPD did not provide a Citizen Complaint Form to Agyeah as he left the police station.

180.    In short, while the cell room supervisor went through the motions of generating and circulating a report, the WPD command and internal affairs staffs sat on their hands, contravening specific provisions and the clear intent of Policy 700 that officers be held accountable for prisoner injuries.

181.    WPD Policy 500 also required that all complaints as well as information on potential complaints received by a WPD employee be sent to BOPS for evaluation and possible investigation.

182.    Like the WPD command staff, in Agyeah's case BOPS did nothing to flag or investigate his allegations.

183.    Besides WPD policy, state law provides a mechanism for police chiefs to keep track of injuries to arrestees and to check on whether officers report and explain them accurately. The law, M.G.L. c. 276 § 33 requires that when arrestees are brought in to a police station the officer in charge shall "immediately examine the prisoner, and if he finds any bruises, cuts or other injuries shall forthwith make a written report thereof to the chief of police of the town concerned…"

184.    The reports generated under M.G.L. c. 276 § 33 are generally referred to as "injured prisoner reports."

185.    Injured prisoner reports if and when reviewed by the Chief of Police serve as a flagging or quality control mechanism for the Chief  and the City to know how its officers use force in the field, and the type of injuries they cause.

186.  But injured prisoner reports were not read then or now by the City's Chief.

187.  The City's failure in Agyeah's case to follow and implement the procedures described in Policy 700 and in M.G.L. c. 276 § 33 was the result of a pre-existing unwritten municipal policy of failing to require officers to account for the use of force or for arrestee injuries and failing to discipline officers for use of excessive force.

188.  At all pertinent times prior to Agyeah's arrest the actual policy, practice, and usage of the WPD and the City was to make no substantive inquiry into complaints of injured prisoners at booking and no substantive inquiry into unreported or unexplained injuries to arrestees.

189.  The failures of the City and of Augustus to require police accountability for the use of force to comply with the injured prisoner report and to impose discipline for use of excessive force and other misconduct, demonstrated their deliberate indifference to the rights and safety of citizens who come in contact with police.

190.  These failures, which were the well-established policy, practice and usage of the City prior to Agyeah's arrest, caused the Defendant officers to understand they could with impunity punish Agyeah for recording them by physically harming him, towing his vehicle, and prosecuting him criminally.

191.  The said failures of the City and Augustus to enforce their stated policy, as set forth above, was the moving force that caused the defendant officers to assault, injure and maliciously prosecute Agyeah for exercising his First Amendment right to record public conduct.

**Tolerance of police racism and intolerance for video recording of police conduct**

192.  As set forth above, Agyeah was the target of reprisals and racist hate speech by an officer because he is Black and because he video recorded their public conduct.

193.  The *de facto* policy, custom, and practice of the City and Augustus of not investigating arrestee complaints and failing to hold officers accountable for misconduct is notable in the use of force to prevent video recording of police conduct and in the tolerance of racist hate speech by officers directed at arrestees of color.

194.  By way of example and not limitation, after BLM rally and demonstration that followed into the Main South area of the City on June 1, 2020, at least three bystanders who had tried to video record the event alleged their phones had been stolen, erased or damaged by members of the WPD.

195.  Although the number of individuals who was falsely arrested was greater, all of previously referenced individuals were arrested and maliciously prosecuted for crimes they did not commit.

196.    One man alleged officers shoved him against a wall, where one of them called him a homophobic slur, threatened to break his arm and took his phone,  which was later returned with some of the video of the police vs. civilian interactions erased.

197.    Street video later obtained from a City pole surveillance camera demonstrates that the police narrative that led to Mr. Cummings arrest was complete fabrication, a police Lieutenant alleged Cummings, a photojournalist filming the protest "made his way past the front line following orders to disperse. Cummings was taken into custody by Operations officers who were holding a position at the rear of our lines."

198.    The street surveillance video demonstrates Cummings was peacefully standing next to a retaining wall not far away from Worcester police officers when they decided to arrest him.

199.    Cummings has alleged that when handcuffed and walked by officers to the police transport wagon an officer referred to a couple of arrestees already in the wagon who appeared to be upset by arrest as "Spics," and told him they were going to hurt him.

200.    In another case from the same demonstration, a man, Mr. Amarat who was live streaming on his phone while inside of a car, was arrested after police falsely alleged he had "began yelling obscenities after he was repeatedly told to stop."

201.    Instead, the live streaming video demonstrates that Amarat was not doing what the police alleged he did.

202.    The police report did not document Amarat was assaulted, forcefully removed from the interior of a vehicle while making a statement directed to a passenger that could not have lawfully served as the basis for his arrest.

203.    While other items confiscated from Amarat by police were returned to him his cell phone wasn't and was kept by one of his arresting officers. See: **https://www.youtube.com/watch?v=z0lu2szCyWo**

204.    In another case, a live stream video recovered from a phone police left unattended on the public following the arrest of college student, the video shows the sole of a Worcester officer's boot as it repeatedly stomped on the phone in an attempt to destroy it. https://drive.google.com/file/d/1Hcg5tHnFqHRvK1QuTOGUgpYNkgbK51XE/view?ts= 5f0e1550

205.    In another arrest related to the June 2020 protest, a female, who is white, was arrested, by Worcester officers called a "stupid bitch," a "nigger-lover," and was punched in the face and hit with a police baton.

206.   Her police did not mention that she was hit with a police baton or described any of the injuries they caused her.

207.   Instead, the report described her arrest vaguely without no mention of the actual force used, "….Pasquantonio ….was taken to the ground and was given several commands to stop resisting and place her hands behind her back."

208.   Mr. Euga, another person arrested during the evening told the Worcester booking officer he had received injuries to his eyes from being punched during his arrest, and yet his arrest report simply stated "Euga refused to leave despite numerous commands to and began to advance towards officers. At this time myself and other officers attempted to place Euga in handcuffs and under arrest. I ordered Euga to place his hands behind his back but he refused to do so and pulled away from us. We were eventually able to place him in handcuffs."

209.   In November 2018, and individual named Guevara pulled out his cell phone to record as Worcester police as they arrested his friend.

210.   A WPD officer became upset Guevara was recording his friends arrest told his police partner to "Get him."

211.   The police spotted this, but did not notice another bystander was also recording them--as two of the officers chased and tackled Guevara one them took Guevara's phone and threw it into the street to get rid his phone.

212.   Guevara was arrested on seven criminal charges, including assault and battery on an officer and resisting arrest, malicious destruction of property, disorderly conduct, disturbing the peace and interfering with a police investigation.

213.   He was accused of physically pushing away from an officer with both hands and taking off running.

214.   A phone video from a third party demonstrates that three officers that came in contact with him filed false police reports because Guevara did not push an officer.

215.   After the bystander video came to light the Commonwealth dismissed the charges pending against him.

216.   During the fall of 2020 Chief Sargent told the Worcester Human Rights Commission and the Worcester Board of Health that in his 35 years with the WPD he had not observed racism within the department.

217.  A recent article published in the Worcester Telegram & Gazette debunked Chief Sargent's inaccurate assertions. Petrishen B, Despite Chief's claim, Worcester Investigated racists police incidents. https://www.telegram.com/story/news/2021/02/06/worcester-police-chief-steven-sargent-institutional-racism-denial-telegram-gazette-investigation/4384051001/

218.  But in the past eight years the WPD has internally investigated six race-related complaints, including at least four of which Sargent knew about, according to the newspaper article.

219.  In one case an officer was allowed to retire prior to the completion of an investigation which found she had used a racial slur to describe three Black teenagers employed by the City.

220.  The female officer, an ex member of vice squad, texted her direct supervisor the following in reference to the Black teenagers she had come in contact with: "Fucking niggers! Bet you miss all my sweet talk L.O L. by the way delete that after you read it never want to keep the evidence."

221.  Although City Manager Augustus and the Chief of police were aware of the incident, they did not try to terminate the officer, instead allowing her to quietly retire from the department months after sustaining the complaint.

222.  Similarly, most of the other cases involved allegations of WPD officers directing racial epithets at residents or at officers of color.

223.  The current commander of BOPS, Captain Kenneth Davenport, and three other officers of color sued the City in 2013 alleging racial discrimination in promotions within the WPD.

224.  Three of four officers that filed the lawsuit were promoted within a year of the settlement of the lawsuit including Captain Davenport, the first Black Captain in the WPD.

225.  According to the article and records provided to the newspaper, Captain Davenport told the WPD Bureau of Professional Conduct that he'd twice heard Hispanics being referred to as "Spics."

226.  Again, according to that report prior to that lawsuit settling the former Chief of Police for the City had signed of an extensive investigative report that reviewed plaintiff's allegations of racism throughout the police department.

227.  The investigative report signed by the Chief had concluded that claims of racism "appear to have been made with reckless disregard to for their truth or falsity."

228. The investigation of racism within the department lost traction when the lead investigator concluded the allegations the men brought were "based on inaccuracies at best, and false statements at worst."

229. Another allegation examined by the paper involved a report made by an officer who claimed to be of Hispanic heritage who reported hearing racial epithets used on the job to refer to them.  His allegations were not sustained.

230. Another one involved a statement allegedly made by a White sergeant to a Black officer whom he allegedly called a "Black motherfucker" during an incident at the station in 2015.

231. Though the Sergeant denied using the word, three other officers confirmed hearing it.

232. Those allegations were sustained, including charges of untruthfulness, discourtesy and conduct unbecoming a police officer, and yet, the City Manager did not terminate the police supervisor.

233. On December 1, 2014 a pretrial detainee at the WPD was beaten while in handcuffs by a white officer inside of a police cell.

234. None of his police colleagues stepped in or intervened to stop the assault including a supervisor that watched while other laughed.

235. A video from cell room captured a different officer asking his colleagues, "Why didn't he [Officer Motyka] knock him out?

236. When Officer Motyka's colleagues were questioned about the incident during the police investigation some had no independent recollection of the incident that resulted in Motyka's arrest and prosecution.

237. Another officer was heard laughing at Jones who is Black while stating: "Hands up, don't …and Motyka who was overheard making reference of the color of Jones skin "Ya don't forget the hand up. I didn't do anything. I was innocent."

238. All officers implicated during that investigation, except Motyka, were allowed to retire, no of them were fired.

239. During early 2012 members of the vice squad executed a search warrant for drugs in the apartment of a Black male in Worcester.

240. The Black male, a tall and heavy framed man, after his arrest, told police officers during his booking and as part of an internal affairs complaint he brought, he was beaten after being placed in handcuffs and "degraded."

241.   While police searched his apartment they made fun of him musing how a large man of his size could live in such a small apartment.   They told him he was like a "big gorilla" who reminded them of the guy from the "Green Mile movie."

242.   Det. Ryder was one of the Worcester vice- squad officers involved in that man's drug investigation and with his arrest.

**Other recent incidents demonstrating a climate of police impunity**

243.   Recently a number of lawsuits and events have been captured on phone or in other video surveillance systems that have raised serious questions about how Worcester officers frequently use unreasonable force in the field.

244.   On August 1, 2020, Mr. Ayala-Melendez, sued two police officers and the City of Worcester alleging that Worcester police K-9 officer without legal justification allowed a police K-9 to bite him and charged him with serious crimes including assault on a police officer, resisting arrest on a fictional account of riotous conduct.  *Christopher Ayala Melendez v. Officer Shawn G. Tivnan, et al*, Case No. 1:20-cv-11453, Dkt. 1 (D. Mass. Aug. 1, 2020).

245.   A surveillance video from a nearby building demonstrates Ayala-Melendez asked a WPD officer for permission to enter into his apartment building.

246.   What followed was a false police narrative in which Officer Shawn Tivnan accused Ayala-Melendez of a number of crimes he not committed.

247.   Officer Tivnan falsely stated in his report he "….[o]bserved officers up against the building trying to protect arrestees as the crowd closed in. More officers arrived and attempted to disperse the violent crowd, several people pushed past in an attempt to go towards the officers with the arrestees. One such male, later identified as Christopher Ayala-Melendez, pushed past officers and was yelling towards the arrestees. I gave him a lawful order to leave the area and he refused. I was able to gain control of his upper right arm with my right hand to stop him from interfering with officers attempting to restore order. I then attempted to escort Ayala-Melendez away from the affray. Ayala-Melendez broke free from my grasp and came towards me and K9 Mattis aggressively and assaulted me by pushing me with his hands on my right shoulder. It should be noted that I was a fully uniformed police officer giving him a lawful command, with a police K-9 at the heel position, wearing a harness labeled "WORCESTER POLICE" and a Worcester Police patch. I then performed a palm heel strike to Ayala-Melendez's supper body in an attempt to cease his assaultive behavior and create distance, causing him to spin. At the same time, per training, K-9 Mattis reacted and stop the assaultive behavior towards me and bit Ayala-Melendez in the lower left back. I immediately gave commands to Ayala-Melendez to step away and get on the ground. At this time Ayala-Melendez's sweatshirt began to rip as he moved away from K-9 Mattis and I again gave commands to Ayala-Melendez to get on the ground to which he refused. He was taken to the ground by other

officers and into custody (See supplemental reports)."

248.  Ayala-Melendez' criminal defense counsel provided a private video surveillance of the incident to the Office of the Worcester District Attorney's Office which contradicted Officer Tivnan's false police narrative. See, **https://www.youtube.com/watch?v=ztBvNrbtCa8&feature=youtu.be**

249.  On June 16, 2020, the Worcester County District Attorney's office filed a motion to dismiss with the Worcester District Court.

250.  The District Attorney's Office moved to dismiss the criminal complaint against Ayala-Melendez without prejudice claiming "The Commonwealth makes this request after a review of the currently available evidence in this case, including police reports and video surveillance tapes."

251.  Without the existence of the highly exculpatory video Ayala-Melendez faced the possibility of being found guilty and of jail time.

252.  The City Manager did not move to terminate Officer Tivnan. He continues to work in the WPD operations division as a patrol albeit, without his police companion K-9 Mattis.

253.  Ayala-Melendez' case presents a textbook case for why officer body-worn cameras are so critical to police accountability in Worcester.

254.  Despite these shocking revelations the reaction by City of Worcester, its Chief of Police and the City Manager have been short of astonishing.

255.  Although citizen shot videos provided irrefutable evidence of widespread police malfeasance, after a trial of body cameras worn by police officers, in July 2020, Chief Sargent, effectively killed any chance that officers would be required to wear body cams.

256.  To justify the scrapping of badly needed body-worn cameras, he said, cameras would make some officers feel "pressure to maintain the demeanor of someone testifying in court" and that it "has the potential to hurt officers' enjoyment of their jobs, and to reduce community engagement."

257.  Chief Sargent with the blessing of the City Manager also stated if cops had to wear body cams "some officers might be less willing to engage in proactive policing when they are afraid that every mistake they make has the potential to subject them to public criticism" and officers might become hesitant to use necessary force because due to concern over being criticized by the media.

258.  The Chief's statements are further evidence of the policy, practice, and usage of the WPD, the City and of Mr. Augustus of allowing police to use force without effective oversight, accountability and where appropriate discipline or criminal prosecution.

259.   Recent revelations underscore the need to require the use by WPD of body worn cameras but the City Manager and the Chief of Police have done little to require them.

260.   Recently, the police Chief issued a five-day suspension to a Worcester police officer who was filmed slapping a person tied up in an ambulance stretcher.  See report by Croteau SJ, Masslive: **https://www.masslive.com/worcester/2021/02/worcester-police-officer-shown-in-video-slapping-man-in-stretcher-suspended-after-internal-investigation.html**

261.   Video from a citizen phone captured the police assault of that individual**.**
    **https://www.youtube.com/watch?v=wxtURqcEeXA**

262.   Upon information and belief, when the suspension became effective a group of officers in the WPD called in sick in protest of the chief's imposed five-day suspension against the sanctioned officer.

263.   Aware of the imposed sanction, the City Manager agreed with it and the officer responsible for the assault and battery of that man was not charged criminally.

264.   Recently as well, another Worcester Police Officer, Officer Escobar was given a second chance when he was caught drunk while driving on railroad tracks.  See, **https://www.masslive.com/worcester/2021/01/a-year-after-being-accused-of-driving-onto-railroad-tracks-while-drunk-worcester-police-officer-michael-escobar-to-return-to-duty.html**

265.   On September 8, 2020, the mother of a 10-year old autistic boy sued two Worcester police officers in the United States District Court alleging the unreasonable use of force that occurred when she called an ambulance after her child threw a tantrum and hurled a plastic beverage container inside of her car. Beshai Torres, PPA, JT, a minor v. Officer Alers, et al, Case No. 4:20-cv-40115-TSH Dkt, Dk. 1 (D. Mass. Sept. 8, 2020).

266.   The officers dragged the 10-year old boy after he threw a small bag of potato chips from the car and broke his right arm causing an epicondyle avulsion fracture that required surgery, hospitalization and follow-up medical care.

267.   Though none of the officers reported any injuries to the child, no investigation was ever undertaken until the filing of the federal suit and no one was or will be disciplined.

268.   These policies, customs and practices of the City and of Mr. Augustus demonstrate gross negligence, reckless indifference to the rights of citizens and were the direct moving force behind the violations of Agyeah's constitutional rights.

## COUNT I
### 42 U.S.C. § 1983: Use of excessive force
### Det. Calhoun, Det. Ryder, Officer McGrath and Cortis

269. Each of the foregoing paragraphs is incorporated by reference.

270. Defendants' actions deprived Agyeah of well-established rights including freedom from the use of unreasonable force under the Fourth Amendment.

271. As a direct and proximate result of the foregoing, Agyeah suffered the injuries and trauma described above.

## COUNT II
### 42 U.S.C. § 1983: Failure to Protect or Intervene
### Calhoun, Cortis and Does 1-3

272. Each of the foregoing paragraphs is incorporated by reference.

273. Defendant officers were present and had opportunity to intervene and halt the false arrest of the plaintiff done with excessive force resulting in injury and failed to do so.

274. The said Defendants failed to report the foregoing or to take other action to stop the malicious prosecution of the plaintiff.

275. Defendants' actions deprived Agyeah of well-established rights including freedom from the use of unreasonable force under the Fourth Amendment.

276. As a direct and proximate result of the foregoing, Agyeah suffered the injuries described above.

## COUNT III
### 42 U.S.C. § 1983: Det. Cortis, Calhoun, Det. Ryder, McGrath, & Randall First Amendment Claim

277. The above paragraphs are incorporated by reference.

278. Defendants, acting in concert denied the Plaintiff's right under the First Amendment to the United States Constitution to video record public police conduct, and for exercising that right they retaliated against him by confiscating his cell phone, by assaulting and injuring him, and by falsely arresting and maliciously prosecuting him for crimes they knew he did not commit.

279. Defendants' actions deprived Agyeah of well-established rights including freedom of speech and to freedom from arrest without probable cause under the under the Fourth Amendment as applied under the Fourteenth Amendment.

280. As a direct and proximate result of the foregoing, Agyeah suffered the injuries described above.

## COUNT IV
### Assault and Battery
### McGrath, Calhoun, Ryder and Cortis

281. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

282. Defendants committed the tort of assault and battery on Agyeah without legal justification, cause, excuse, or privilege.

283. As a direct and proximate result thereof, the plaintiff suffered the injuries as described above.

## COUNT V
### 42 U.S.C. § 1983: Monell Claims Against City of Worcester, and supervisory claims against City Manager Augustus

284. Each of the foregoing paragraphs is incorporated by reference.

285. The policies and customs of the City of Worcester and of City Manager Augustus as described above were the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

286. The policies and customs of the City and of City Manager Augustus and their failure to train, supervise and discipline /their subordinates was the moving force behind the violations of Plaintiff's constitutional rights by Defendants.

## COUNT VI
### Det. Calhoun, Ryder, McGrath, Cortis and John Does 1-3
### Intentional Infliction Emotional Distress

287. Each of the foregoing paragraphs is incorporated as if fully set forth herein.

288. Defendants' outrageous actions and speech, coupled with their unreasonable use of force constituted intentional infliction of emotional distress.

289.  Defendants subjected Agyeah to reprehensible conduct knowingly, intentionally, willfully, purposely, maliciously, and recklessly.

290.  The Defendants' conduct as officers sworn to uphold the law and protect the public in assaulting and injuring the plaintiff, berating him with threatening and racist hate speech, and perjuring themselves in the effort to convict him unjustly was extreme and outrageous.

291.  It was foreseeable to the defendants, and it was their intent, that their conduct would cause the Plaintiff severe hardship and emotional distress.

292.  As a direct result of the intentional conduct of the defendants in this count, Agyeah suffered severe emotional distress and great pain of body and mind.


**COUNT VII**
**Civil Conspiracy under Section 1983**
**Det. Calhoun, Ryder, Randall, McGrath, Cortis, Piskator and John Does 1-3**

293.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

294.  The Defendants conspired to use their authority acting under color of law to deprive Agyeah of his constitutionally protected rights to video record public police conduct, to freedom from seizure that is unreasonable by virtue of false arrest and excessive force, and his right to due process.

295.  As a direct and proximate result of conduct done in furtherance of each of the conspirators' objectives, Agyeah suffered damages.


**COUNT VIII**
**Civil Conspiracy under Massachusetts common law**
**Det. Calhoun, Ryder, Randall, McGrath, Cortis, Piskator and John Does 1-3**

296.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

297.  The Defendants conspired to accomplish the unlawful ends of denying Plaintiff the right to video record public police conduct and of retaliating against him for engaging in that activity.

298.  They conspired to accomplish these ends by the unlawful means of confiscating his phone, falsely arresting him, assaulting him without legal cause or excuse, by malicious prosecution of him, and by the giving of false testimony in furtherance of the prosecution.

299.  Each defendant participated in conduct done in furtherance of the conspiracy and/or gave substantial assistance and/or encouragement to others who engaged in the conduct.

300.  As a direct and proximate result thereof, plaintiff suffered the harms and losses set forth herein.

## COUNT IX
### False Arrest
### Det. Calhoun, Det. Ryder

301.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

302.  At the time and place of his arrest there was no probable cause to believe the plaintiff had committed any crime, nor was there any basis upon which a police officer could reasonably believe otherwise.

303.  As direct and proximate result of his false arrest plaintiff was wrongfully seized, assaulted, injured, and prosecuted without cause.

## COUNT X
### Federal Malicious Prosecution
### Det. Calhoun, Det. Ryder, McGrath

304.  Each of the foregoing paragraphs is incorporated as if fully set forth herein.

305.  Defendants caused criminal charges to be brought against plaintiff for which there was no probable cause, and they maliciously and for no lawful purpose assisted, participated in and otherwise caused this plaintiff to be criminally prosecuted.

306.  Plaintiff had a favorable result at trial regarding all charges but the resisting arrest charge.

307.  His conviction on that count was unjust and an appeal and motion for new trial are pending.

308.  As a direct and proximate result thereof, plaintiff, lost time from his usual activities to attend court and to participate in his defense, and suffered concern and worry due to the reasonable perception that his liberty, well-being and good name were at imminent and serious risk as a result of his criminal prosecution.

**COUNT XI**
**Massachusetts Civil Rights Act, M.G.L. c. 12 § 11H, 11I**
**Calhoun, Ryder, Cortis, and Randall and McGrath**

309.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

310.   Defendants Calhoun, Ryder and Cortis and Randall used threats, intimidation and coercion to stop and prevent the plaintiff from engaging in the lawful activity of video recording police conduct.

311.   The said defendants used their powers of arrest and criminal prosecution to retaliate against Agyeah for the aforesaid lawful activity and to threaten, coerce, and intimidate him in order to induce him engaging in the activity subsequently.

312.   As a direct and proximate result thereof, the plaintiff suffered the injuries as described herein.

**COUNT XII**
**Due Process, 42 U.S.C. § 1983**
**Ryder, Calhoun, McGrath**

313.   Each of the foregoing paragraphs is incorporated as if fully set forth herein.

314.   By their conduct as set forth herein, the Defendants, individually, jointly, and in conspiracy with one another, and acting under color of law in their capacity as police officers by their perjured testimony denied Agyeah a fair trial in violation of his right to due process under the 14th Amendment to the United States Constitution.

315.   In addition Calhoun produced a report of Agyeah's arrest and a statement of facts in support of his prosecution that were false and fraudulent in their depiction of Agyeah as disorderly, disturbing the peace, interfering with police, and resisting arrest.

316.   Defendants intentionally or recklessly made false statement, and withheld exculpatory evidence to support his criminal prosecution.

317.   Defendants deliberately fabricated evidence against Agyeah for crimes he did not commit.

318.   The Defendants' misconduct was objectively unreasonable and was done intentionally, with malice, with reckless indifference to the rights of Agyeah, and with complete disregard of his innocence.

319.   As a direct and proximate result of the foregoing, Agyeah was unjustly convicted of resisting arrest, suffered physical and mental injuries and economic loss.

**WHEREFORE**, Plaintiff respectfully requests the following relief:

1.     All compensatory damages in a sum according to proof;

2.     All punitive damages against the Defendants' in a sum according to proof;

3.     Injunctive relief;

4.     Award costs of this action, including reasonable attorney's fees and;

5.     Award such other relief as the Court deems just and proper;

<u>**JURY DEMAND**</u>

Respectfully submitted,
Plaintiff SYLVESTER AGYEAH
By his attorneys,

*/s/ Hector E. Pineiro*
_____
Hector E. Pineiro (BBO# 555315)
Robert A. Scott (BBO# 648740)
Law office of Hector E. Pineiro, P.C.
807 Main Street
Worcester, MA 01610
Tel. (508) 770-0600
hector@pineirolegal.com
robin@pineirolegal.com

DATED: February 16, 2021